In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-1823

ANDERSON FEDERATION OF TEACHERS, *et al.*,

*Plaintiffs-Appellees*,

*v.*

TODD ROKITA,

*Defendant-Appellant*.

Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division.
No. 1:21-cv-1767 — **Sarah Evans Barker**, *Judge*.

ARGUED JANUARY 10, 2024 — DECIDED NOVEMBER 2, 2026

Before SYKES, HAMILTON, and LEE, *Circuit Judges*.

LEE, *Circuit Judge*. The State of Indiana allows any employee to assign a portion of their wages to pay for certain statutorily-identified expenses, including union dues. The employer then automatically deducts the assigned portion from the employee's paycheck.

In 2021, Indiana enacted a law that required public school employees to submit a written acknowledgment of rights and

undertake additional steps if they wanted their employers to automatically deduct union dues from their paychecks. These requirements did not apply to any other public employees. Three teachers' unions and individuals from those unions challenged the legislation, arguing that the additional requirements violated their rights to Free Speech and Free Association under the First Amendment. The district court agreed that the legislation at issue violated their freedom of association rights and entered a permanent injunction. For the reasons below, we affirm.

## I. Background

Like many states, Indiana has a general wage assignment statute. *See* Ind. Code § 22-2-6-2. Under it, public and private employees can request that their employers implement automatic payroll deductions for a variety of expenditures. Among these are union dues. *Id.* § 22-2-6-2(b)(5).

Section 22-2-6-2 sets forth certain requirements for the commencement of automatic payroll deductions. The requesting employee must make the assignment in writing; the assignment must be signed by the employee personally; the employer must agree to it in writing; and the employee must be able to revoke the assignment at any time by submitting a written request to the employer. *Id.* § 22-2-6-2(a)(1).

Despite § 22-2-6-2's general applicability, a separate statute, § 20-29-5-6, governs the steps a "school employee" must take in order to have union dues automatically be deducted

from the individual's paycheck. *See id.* § 20-29-5-6.[1] This statute provides that "[d]eductions under this section must be consistent with" the provisions in § 22-2-6-2. *Id.* § 20-29-5-6(b)(1).

In 2021, the Indiana legislature amended § 20-29-5-6 in Senate Enrolled Act 251 ("SEA 251"). The amendments grant teachers "the right to resign from, and end any financial obligation to" a teachers' union at any time. *See* Ind. Code § 20-29-5-6(c)(1).

Relevant here, the 2021 amendments also established new procedures teachers must follow before union dues can be automatically deducted from their paychecks. For example, when requesting such a payroll deduction, the teacher must sign an authorization form containing the following statement that appears in 14-point type boldface font:

> I am aware that I have a First Amendment right, as recognized by the United States Supreme Court, to refrain from joining and paying dues to a union (school employee organization). I

[1] Indiana law defines "school employee" as "a full-time certificated person in the employment of the school employer," Ind. Code § 20-29-2-13, and a "school employer" as "the governing body of" a "school corporation" or a "charter school established under" Indiana law, *id.* § 20-29-2-15. In turn, a "certificated employee" is defined as "a person … whose contract with the school corporation requires that the person hold a license or permit from the division of professional standards of the department under IC 20-28; or … who is employed as a teacher by a charter school established under IC 20-24." *Id.* § 20-29-2-4. IC 20-28 addresses the permitting and licensing guidelines for "school teachers." *Id.* § 20-28. For ease of reference, we will thus refer to "school employees" as "teachers" and "school employee organizations" as "teachers' unions" or "unions."

> further realize that membership and payment of dues are voluntary and that I may not be discriminated against for my refusal to join or financially support a union. I authorize my employer to deduct union dues from my salary in the amounts specified in accordance with my union's bylaws. I understand that I may revoke this authorization at any time.

*See id.* § 20-29-5-6(c)(3).

In addition, teachers who would like to have their union dues automatically deducted from their paychecks must renew their authorizations annually. *Id.* § 20-29-5-6(c)(4). And, before honoring the request, the school employer must send a message to the teacher's official work email address and wait for a return confirmation from the same email address. *Id.* § 20-29-5-6(c)(2).

But there is more. The statute also requires school employers to provide written or electronic notice to their teachers every year informing them of their right to quit the union and stop paying union dues. *Id.* § 20-29-5-6(c)(6). The notice must attach the authorization form noted above, as well as the amount the teacher "will be liable to pay to the school organization during the duration of the authorization, if the employee does not revoke authorization before it expires." *Id.*

Three Indiana teachers' unions and several of their members (collectively, "Plaintiffs") filed suit, alleging that SEA 251 violated their First Amendment rights. In their view, the authorization form violated their First Amendment right to be free from compelled speech by requiring them to adopt the mandated statement. They also argued that SEA 251 infringed

upon their right to freedom of association by imposing burdensome payroll deduction requirements for union dues that did not apply to other public employees.

The district court agreed that SEA 251 violated the First Amendment by improperly compelling speech and issued a preliminary injunction to remedy that violation. At the same time, it rejected the unions' freedom of association claim. *Anderson Fed'n of Tchrs. v. Rokita*, 666 F. Supp. 3d 789, 796 (S.D. Ind. 2023).

Shortly thereafter, Indiana enacted Senate Enrolled Act 297 ("SEA 297"), which amended the portions of SEA 251 the district court found constitutionally deficient. As relevant here, SEA 297 revised the mandated statement on the authorization form as follows:

> The State of Indiana wishes to make you aware that you have a First Amendment right, as recognized by the United States Supreme Court, to refrain from joining and paying dues to a union (school employee organization). Your membership and payment of dues are voluntary, and you may not be discriminated against for your refusal to join or financially support a union. By signing this form, you are agreeing to authorize your employer to deduct union dues from your salary in the amounts specified in accordance with your union's bylaws. You may revoke this authorization at any time.

Ind. Code § 20-29-5-6(c)(3).

In response, Plaintiffs amended their complaint and sought summary judgment and an order permanently

enjoining SEA 251 and SEA 297, raising the same arguments as before. The State in turn filed a cross-motion for summary judgment.

In the end, the district court granted summary judgment in the State's favor on Plaintiffs' free-speech claim, satisfied that the new language in the authorization form did not impermissibly compel speech. At the same time, the district court determined that SEA 251 and SEA 297 imposed restrictions upon teachers and their unions because of their viewpoint. This triggered strict scrutiny, and because the statutory requirements were not narrowly tailored to serve a compelling government interest, the district court ruled that SEA 251 and SEA 297 violated the First Amendment and permanently enjoined the State from enforcing them.

The State appeals, challenging the district court's entry of judgment against it. In response, Plaintiffs defend the judgment but disagree with the district court's ruling as to its compelled-speech claim, arguing that the claim provides an alternative, independent ground to affirm the judgment if we disagree with the district court's conclusion that SEA 251 and SEA 297 violate their right to freedom of association.

## II. Analysis

We review summary judgment determinations as well as questions of constitutional law *de novo*. *Weinberg v. City of Chicago,* 310 F.3d 1029, 1035 (7th Cir. 2002). We first turn to the compelled-speech claim and then examine the freedom-of-association claim.

### A. The Deduction Authorization Form

The First Amendment's Free Speech Clause "prohibits the government from telling people what they must say."

*Rumsfeld v. Forum for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 61 (2006). At the same time, it "does not regulate government speech." *Matal v. Tam*, 582 U.S. 218, 234 (2017) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)). When the government speaks, "it is entitled to say what it wishes" and "may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995) (citation modified). Commonsensically, for a "government to work," it must be able to choose what to say and what not to say. *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022). And, while the Constitution prohibits the government from regulating private speech based on viewpoint, the ballot box acts as the main check on government speech. *Id.* at 252 ("The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks.").

At issue is SEA 297's requirement that the employee authorization form contain the amended statement quoted above. And the first question is whether the statement is government speech or private expression.

The boundary between government speech and private expression is sometimes difficult to tease out, particularly where the government is the one proposing the speech. To do so, we engage in "a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Id.* Among the relevant factors are "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* (citing *Walker*

*v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–14 (2015)).

In this case, the statement in question originated with the government, the government controlled the message, and a reasonable person reading the statement would conclude that it is the government that is speaking. *See Choose Life Ill., Inc. v. White*, 547 F.3d 853, 863 (7th Cir. 2008).

Plaintiffs, however, see things differently. The test they espouse asks whether the message is one they wish to send. This is so because, in their view, when teachers are forced to sign the authorization form, they must adopt the statement even if they wish not to do so.

The Constitution ensures "that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943). Accordingly, the Supreme Court has held, for example, that schoolchildren may not be forced to recite the Pledge of Allegiance, *id.*, nor may drivers be required to display a state's motto on their license plates, *Wooley v. Maynard*, 430 U.S. 705, 717 (1977). But in those cases, the government is requiring an individual to act as a conduit for its message.

By contrast, the authorization form does not require teachers to adopt Indiana's advisory statement as their own. By its terms, it is an informatory statement, and it is the State of Indiana—not the teacher—that is doing the informing. Accordingly, we agree that the mandate in SEA 297 requiring the dues authorization form to contain the statement in question

does not violate the Free Speech Clause of the First Amendment.

**B. Additional Requirements for Teachers**

Turning to the freedom-of-association claim, as we noted above, although all employees in Indiana can elect to have their union dues deducted automatically from their paychecks after meeting certain basic prerequisites, Ind. Code § 22-2-6-2, SEA 251 and SEA 297 impose additional requirements on teachers. The question is whether, by requiring teachers to jump through these additional hoops, the State is engaging in viewpoint discrimination in violation of the First Amendment.

**1. Government Subsidy of Speech**

As a preliminary matter, the parties agree that a public employer's agreement to process automatic payroll deductions is a form of government subsidy. *See Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 652 (7th Cir. 2013) ("At bottom, the use of the state payroll system to collect union dues is a state subsidy of speech."). The parties also acknowledge that the State may levy conditions on a government subsidy and that such conditions do not run afoul of the First Amendment so long as they are viewpoint neutral. *See id.* at 645, *Camelot Banquet Rooms, Inc., v. U.S. Small Bus. Admin.*, 24 F.4th 640, 646 (7th Cir. 2022); Where the parties disagree is whether the additional requirements SEA 251 and SEA 297 impose on teachers are in fact viewpoint discriminatory.

Plaintiffs believe the restrictions improperly target them because of their viewpoint. The unions' operations, they say, rely on funds collected from their members. The ability to automatically deduct dues allows unions to avoid the

transaction costs typically associated with requesting and processing dues, such as postage fees and credit card transaction fees. SEA 251 and SEA 297 make it more difficult for teachers to use automatic deductions, which in turn increases the costs for teachers' unions while not impacting other types of unions in the same way. Thus, Plaintiffs argue, SEA 251 and SEA 297 specifically target the ability of teachers to join and support the unions that further their interests, violating their First Amendment right to freedom of association.

The State disagrees. In its view, because the payroll deduction system is a government subsidy, Indiana is free to impose restrictions on some unions and not others without trampling on the First Amendment, so long as it does not favor one viewpoint over another. *See Walker*, 705 F.3d at 646 ("A government subsidy that discriminates among speakers does not implicate the First Amendment unless it discriminates on the basis of ideas.") (internal quotation marks omitted). And, given that teachers rarely all espouse one particular view and often have many diverse (sometimes conflicting) opinions on various issues (or so the State contends), legislation directed at teachers as a group cannot be viewpoint discriminatory.

The State is correct that the First Amendment imposes no requirement that it subsidize all public employee unions equally. "The First Amendment prohibits government from abridging the freedom of speech; it does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression." *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 355 (2009) (internal quotation marks omitted).

As we have observed elsewhere, "[t]he Supreme Court has repeatedly drawn a line between government regulation of

speech, on the one hand, and government subsidy of speech, on the other." *Camelot Banquet Rooms*, 24 F.4th at 646. And the Court's decisions "show that the government is not required to subsidize activity simply because the activity is protected by the First Amendment." *Id.* (citing *Ysursa*, 555 U.S. at 358–59; *Rust v. Sullivan*, 500 U.S. 173, 193 (1991); *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983)).

The government's ability to subsidize speech, however, is not without constitutional bounds. Even when it comes to a subsidy, the government cannot limit access to benefits based on a speaker's "specific motivating ideology, opinion, or perspective." *Rosenberger*, 515 U.S. at 820.

Here, the State points out that SEA 251's and SEA 297's additional requirements are facially viewpoint neutral. We agree. The heightened requirements do not expressly target teachers or teachers' unions because of their "communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). But the requirements cannot survive constitutional scrutiny on this alone because even facially neutral restrictions can serve as a "facade for viewpoint-based discrimination." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985); *Walker*, 705 F.3d at 648.

To determine whether that is the case here, we look to a number of factors, including government statements or actions justifying the legislation, whether the law is underinclusive in relation to the asserted justification, and the degree to which the restrictions in question serve the stated interest. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564–65 (2011); *United States v. Eichman*, 496 U.S. 310, 315–18 (1990); *see also* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev.

413, 455 (1996) ("[T]he looser the fit between the interest asserted and the contours of the law, the greater the cause for suspicion. … [W]hen the asserted interest is insubstantial or when it does not fit the scope of the challenged regulation[,] the usual presumption of proper purpose topples[.]").

Here, the State justifies the additional requirements SEA 251 and SEA 297 impose on teachers by pointing to the Supreme Court's decision in *Janus v. American Federation of State, County & Municipal Employees, Council 31*, 585 U.S. 878 (2018). There, the Court held that the First Amendment prohibits public sector unions from charging "agency fees" to nonunion employees to cover their proportionate share of the union's costs for collectively bargaining on behalf of the entire unit. But in this case, the impacted teachers have already consented to join and subsidize a union; therefore, *Janus* has no relevance to the issues before us. *See Bennett v. Council 31 of the Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO*, 991 F.3d 724, 732 (7th Cir. 2021) ("*Janus* said nothing about union members who … freely chose to join a union and voluntarily authorized the deduction of union dues, and who thus consented to subsidizing a union.").

Perhaps recognizing this, the State also argues that requiring teachers to provide additional proof of consent reduces the risk that an employer will erroneously deduct union dues from employees who in fact do not want to be part of the union. But if this were the case, one would think that the State would impose additional hoops on *all* public employees rather than just teachers. This patent "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a

particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

The State also cites *Ysursa*, 555 U.S. 353, and *Walker*, 705 F.3d 640, to support their contention that SEA 251 and SEA 297 are viewpoint neutral. But those cases are readily distinguishable.

In *Ysursa*, the plaintiffs challenged a state law banning payroll deductions for political activities. 555 U.S. at 356. In upholding the constitutionality of the statute, the Supreme Court was careful to note that "[t]he ban on political payroll deductions is by its terms not limited to any particular type of political contribution." *Id.* at 361 n.3. Moreover, it continued, "[n]othing in the record suggest[ed] that public employers permit[ted] deductions for some political activities but not for those of unions." *Id.* By contrast, SEA 251 and SEA 297 selectively target teachers and teachers' unions to the exclusion of all others.

The State's reliance on *Walker* fares no better. There, state employee unions brought a First Amendment challenge to a Wisconsin law that, among other things, allowed only "public safety employees" to deduct union dues through payroll deductions while prohibiting such deductions for other state employees. We upheld the law, holding that the distinction between public safety unions and general employee unions was neither facially viewpoint discriminatory nor a façade for invidious viewpoint discrimination. *Walker*, 705 F.3d at 649–50. That a law "disproportionately impacts groups with one particular viewpoint," we noted, "does not transform its facially neutral language into an invidiously discriminatory statute." *Id.* at 651. *But see id.* at 664 (Hamilton, J., concurring in part and dissenting in part) (arguing that "the different

treatment of 'public safety' unions and 'general employee' unions is in reality an unconstitutional exercise in viewpoint discrimination"). We further emphasized that the public safety category encompassed both supporters and non-supporters of the Wisconsin governor, significantly undercutting the plaintiffs' argument that governorship endorsements by certain unions motivated the statute's passage. *Id.*

The regulations at issue here present a different story. SEA 251 and SEA 297 do not just disproportionately impact a group with a particular viewpoint—they intentionally single out public school teachers while allowing other public employees to authorize automatic payroll deductions without additional barriers.[2] The State simply has offered no justification for placing additional burdens on such a particularized group. *See Leathers v. Medlock*, 499 U.S. 439, 447 (1991) (finding a tax "suspect if it targets a small group of speakers").

Resisting this conclusion, the State argues that, like the public safety employees in *Walker*, public school teachers and their unions have a range of opinions on different issues. But the question is not whether teachers agree on everything, lock, stock, and barrel (they most assuredly do not). It is whether, as public school teachers, they adhere to "a specific premise, a perspective, a standpoint from which a variety of

[2] It is true that SEA 251 and SEA 297 purportedly impact all "school employees," but, under Indiana law, "school employees" comprise only charter school teachers and those who hold a professional license or permit pursuant to Article 24 of Title 20 of the Indiana Code. *See* Ind. Code § 20-29-2-13; *id.* § 20-29-2-4. And as we noted earlier, that section lays out the qualifications and requirements for "school teachers." *Id.* § 20-28. Thus, as far as we can tell, SEA 251 and SEA 297 apply only to public school teachers.

subjects may be discussed and considered." *Rosenberger*, 515 U.S. at 831 (holding that a university's decision to withhold certain funds from groups that "primarily promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality" amounted to viewpoint discrimination, even though it did not target a particular religion). It does not require any imagination to conclude that public school teachers and their unions share the overarching interest of promoting teacher salaries and benefits, work conditions, and public education writ large.

Furthermore, whereas the payroll deduction provisions in *Walker* benefitted a range of diverse public safety unions to the exclusion of an even larger category of general employee unions, the provisions here burden a specific group with a shared mission and viewpoint. Although the government can choose whose speech to subsidize through use of school employers' payroll systems to collect union dues, *see Walker*, 705 F.3d at 645, selectively conditioning access to that subsidy for public school teachers and their unions alone is indicative of viewpoint discrimination that the State has done nothing to rebut. Mindful of the Supreme Court's warning that "restrictions based on the identity of the speaker are all too often simply a means to control content," *Citizens United v. Federal Election Commission*, 558 U.S. 310, 340 (2010), we agree with the district court's finding on this record that SEA 251 and SEA 297 effectuate viewpoint discrimination.

**2. Strict Scrutiny**

As "an egregious form of content regulation," viewpoint discrimination "trigger[s] strict scrutiny, a demanding standard that requires the government to prove its restriction on speech is narrowly tailored to serve compelling state

interests." *Chiles v. Salazar*, 607 U.S. 627, 641 (2026) (citation modified). And "[a]s a practical matter, strict scrutiny is 'fatal in fact absent truly extraordinary circumstances.'" *Planned Parenthood Great Nw. v. Comm'r of Ind. State Dep't of Health*, 187 F.4th 939, 960 (7th Cir. 2026) (quoting *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 485 (2025)).

Here, the State asserts that the additional requirements SEA 251 and SEA 297 impose on teachers are rationally related to its interest in reducing the risk of deducting union dues from teachers who do not want to be part of a union and in shielding itself and school employers from any associated liability. But the State stops short of arguing that these interests are "compelling" or that it could not achieve these interests in less burdensome ways. *See Weinberg*, 310 F.3d at 1040. Absent this, the State may not impose additional conditions to receive the benefit of automatic payroll deductions solely because the requesting employee is a teacher.

* * *

For the foregoing reasons, the judgment of the district court is AFFIRMED.